UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

GUILLERMO TORRES,                                    :

               Plaintiff,                 :          OPINION AND ORDER

       -against-                              :          13 Civ. 8224 (GWG)

CAROLYN COLVIN                                       :
Acting Commissioner of Social Security,
                                                     :
             Defendant.
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Guillermo Torres brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)

for judicial review of the final decision of the Commissioner of Social Security denying his

claims for Social Security Disability ("SSD") and Supplemental Security Income ("SSI")

benefits under the Social Security Act.  The parties have consented to disposition of this case by

a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Both Torres and Acting

Commissioner of Social Security Carolyn Colvin (the "Commissioner") have moved for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons stated below,

Torres's motion is denied and the Commissioner's motion is granted.

I.      BACKGROUND

     A.     Torres's Claim for Benefits and Procedural History

      Torres applied for SSD and SSI benefits on May 19, 2011.  See Administrative Record,

filed Mar. 25, 2014 (Docket # 9) ("R."), at 124-41.  He claimed that his ability to work was

limited by "[s]evere depression."  R. 163.  He alleged that his disability began on August 17,

2010, R. 124, 135, when he was 54 years old, see id.  Torres has a high school education and

attended one year of college. R. 58. He worked as a production manager at a public access television station for 15 years, until August 17, 2010, when he was terminated from his job. R. 58-60. That date is also the alleged onset date of his disability. R. 159.

On July 18, 2011, the Social Security Administration denied Torres's applications for SSD and SSI. R. 70-77. Torres then requested a hearing before an Administrative Law Judge ("ALJ"), R. 78-80, which was held on May 18, 2012, R. 54-66. On May 25, 2012, the ALJ issued a decision finding that Torres was not disabled. R. 36-49. The Appeals Council denied Torres's request for review on July 17, 2013. R. 5-10. On November 18, 2013, Torres filed this suit under 42 U.S.C. § 405(g). See Complaint, filed Nov. 18, 2013 (Docket # 1). Both parties have filed motions for judgment on the pleadings.[1]

    B.    <u>Evidence Before the ALJ</u>

        1.    <u>Riverdale Mental Health Center</u>

Torres began receiving treatment at the Riverdale Mental Health Center on December 20, 2010. R. 273. He exhibited a depressed mood upon his intake. Id. He had lost his job due to an allegation of sexual impropriety and was facing bankruptcy and eviction. R. 273-74.

On January 3, 2011, Torres returned to Riverdale Mental Health Center for a "comprehensive psychosocial evaluation," conducted by Paul Heron, a licensed social worker. R. 266-72. Torres stated that he smoked marijuana daily during August 2010 after he was fired from his job but that he was currently abstaining from marijuana use. R. 266. He also

---

[1] See Motion for Judgment on the Pleadings, filed Apr. 25, 2014 (Docket # 11); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed Apr. 25, 2014 (Docket # 12) ("Pl. Mem."); Notice of Motion, filed July 18, 2014 (Docket # 18); Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed July 18, 2014 (Docket # 19) ("Comm'r Mem.").

acknowledged using heroin, cocaine, and crack in the 1980's and 1990's, but stated that he had not used those drugs in several years.  See id.  The evaluation noted that Torres "is somewhat socially isolated" and that his brother had been diagnosed with schizophrenia.  R. 267.  Torres was well groomed, well dressed, and "seems to be able to make and keep appointments etc."  Id. His overall medical health was good.  R. 270.  Mr. Heron diagnosed Torres with cannabis abuse in remission and dysthymia on Axis I, and he identified the severe stressors of unemployment, bankruptcy, and losing home on Axis IV.  R. 272.[2]  He gave Torres a GAF score of 55.  Id.[3]

After that initial evaluation and through December 15, 2011, Torres had regular individual counseling sessions with Mr. Heron.  See R. 275, 277-78, 285-86, 299-302, 307-08,

---

[2]  As last explained in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), the DSM utilized "a multiaxial system" that allowed for the separate assessment of different aspects of a patient's condition.  Id..  The axes were as follows:

| | |
|---|---|
| Axis I | Clinical Disorders [and] Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders [and] Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychological and Environmental Problems |
| Axis V | Global Assessment of Functioning |

 Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed., text revision 2000), at 27. These axes are no longer in use.  See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) (stating that the latest edition of the DSM "has moved to a nonaxial documentation of diagnosis").

[3]  The GAF scale was lasted used in the fourth edition of the DSM and reports an individual's "psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."  Diagnostic and Statistical Manual of Mental Disorders 33 (4th ed., text rev. 2000).  A GAF score of 55 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 34 (capitalization and emphasis omitted).  The latest edition of the DSM, the fifth edition, no longer includes GAF scores.  See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

326-27.  At a session on January 31, 2011, Torres was "angry but not depressed" and declined medication.  R. 307.  On February 16, 2011, he was in a very depressed mood and felt that he would "never be able to get over this."  Id.  On February 23, 2011, Torres was in a "very depressed mood" and appeared unshaven and unkempt.  R. 302.  In a "rapid follow up" on February 25, 2011, Torres appeared clean and shaven but was very depressed and somewhat tearful.  Id.  On February 28, 2011, Mr. Heron noted that although Torres presented with "thoughts of harming himself," he was not suicidal but rather felt "that the hospital would help him get benefits and housing without having 'to wait on lines of 200 people.'"  R. 302.

Torres began treatment with psychiatrist Matthew Gudis, M.D. of the Riverdale Mental Health Center, on March 1, 2011.  See R. 262, 265; see also Pl. Mem. at 2.  At his first visit with Dr. Gudis, Torres complained of depression since August 2010.  R. 262.  He described symptoms of dysphoria, diminished energy and concentration, increased difficulty performing activities of everyday living, decreased appetite without weight loss, disturbed sleep, feelings of panic, preoccupation with past events, and some suicidal thoughts without intent or plan.  Id.  He stated that he had moved in with his elderly father and had attempted to find work but did not know how to explain why he left his previous job.  Id.  Torres reported that he had some supportive friendships.  Id.  On medical status examination, Dr. Gudis found that Torres was well groomed, well dressed, well nourished, and cooperative.  R. 263.  He spoke with a normal rate and tone and made good eye contact.  Id.  His psychomotor activity was normal, his affect was full range and appropriate, and he had no perceptual disorder or abnormalities of thought process.  R. 264.  His judgment and insight were good, with no homicidal ideation.  Id.  His orientation and concentration were normal, his memory and impulse control intact, and his intelligence average.  R. 265.  His mood was depressed and anxious, and he exhibited some

4

suicidal ideation, without active intent or plan.  R. 264.  Dr. Gudis diagnosed Torres with major depression and cannabis abuse in remission on Axis I, loss of job and apartment and financial difficulty on Axis IV, and a GAF score of 52.  R. 265.[4]  He recommended continued therapy and prescribed Lexapro.  R. 265, 306.

At his next visit with Dr. Gudis, on March 31, 2011, Torres reported that the Lexapro had not been helpful, and he complained of gastrointestinal upset, fatigue, and being in a "fog."  R. 304.  Dr. Gudis reported that Torres's mental status was similar to his previous visit.  Id.  Dr. Gudis changed Torres's prescription to Cymbalta.  R. 303, 305.  Torres reported to Mr. Heron on April 11, 2011 that he was in better spirits "now that I'm not on those meds."  R. 301.

At a session with Mr. Heron on April 25, 2011, Torres was "in [a] more positive mood" and had helped a friend in a video lab.  R. 300.  Although this was without pay, Torres reported a "sense of accomplishment" and talked about "doing the things that I can do."  Id.  On May 16, 2011, Torres was again in a "dispirited condition," but on June 2, 2011, his mood was "much improved."  R. 299.

At his next appointment with Dr. Gudis on June 7, 2011, Torres reported that he had not taken the Cymbalta, but that he was experiencing less intense symptoms and had been exercising regularly and was engaged in his unemployment case.  R. 297.  Dr. Gudis prescribed Zoloft.  R. 296, 298.  On June 9, 2011, Torres appeared in "somewhat positive spirits" to Mr. Heron, after having spent a weekend with friends.  R. 286.  Torres reported an improved mood on June 16, 2011, and felt "more energized" on June 23, 2011, which he attributed to the Zoloft.  Id.  On

---

[4]  A GAF score of 52 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) (capitalization and emphasis omitted).

June 30, 2011, Torres reported to Mr. Heron that he had "some misgivings" about a planned trip to Texas to visit his girlfriend, and on July 7, 2011, he said that he did not go to Texas because he wanted to be near his father. R. 285. The next month, on July 28, 2011, Torres appeared in an "increasingly depressed mood" as his father's condition continued to deteriorate, but on August 4, 2011, he was "somewhat encouraged" by news that people at his former job had been asking questions about him. R. 278. At an August 25, 2011 session with Mr. Heron, Torres was very depressed, and he again reported that his father's health had deteriorated. R. 277.

Torres met with Dr. Gudis again on September 8, 2011, when he reported that he had stopped taking Zoloft because he was feeling "edgy" and having gastrointestinal side effects. R. 279. Despite this, he reported feeling "a bit better," though his underlying problems had not changed and he was still experiencing symptoms including dysphoric mood, increased anxiety, unsound sleep, feelings of hopelessness, and anhedonia. Id. Dr. Gudis changed Torres's prescription from Zoloft to Wellbutrin. R. 276, 279-80.

On September 8, 2011, Torres reported to Mr. Heron that he was in a "somewhat hopeless mood." R. 277. On September 29, 2011, Torres was "extremely depressed" and feared that his father was dying. R. 275, 327. At his next meeting with Dr. Gudis, on October 13, 2011, Torres reported that his father had died the week before and that he was "sad about the loss." R. 345, 352. He was sleeping five to six hours per night, and the gastrointestinal side effects he had been experiencing from the Wellbutrin were improving. Id. He seemed "sad," but his depressive symptoms were less intense than a month prior. Id. Dr. Gudis continued him on Wellbutrin. R. 346. On November 17, 2011, Torres met again with Dr. Gudis and reported that he had "been struggling since [his] father's death." R. 338. Dr. Gudis increased Torres's dose of Wellbutrin. R. 339.

6

On December 1, 2011, Mr. Heron noted that Torres was in "better spirits," though he seemed sad about his father's death.  R. 326.  A week later, Torres was in an "angry mood."  Id. On December 13, 2011, Torres reported to Dr. Gudis that he was experiencing depressive symptoms: feelings of hopelessness and sleeping only four hours per night.  R. 330.  Dr. Gudis again increased his Wellbutrin dose.  R. 331.  On December 27, 2011, Dr. Gudis noted that Torres had been taking this new dose for approximately one week and that it had helped him "to fend off depressive thoughts and to be somewhat more energetic."  R. 324.  Dr. Gudis continued him on Wellbutrin.  R. 325.  Torres met again with Dr. Gudis on January 17, 2012, reporting that his anxiety had decreased, he had not been experiencing severe depressive symptoms, and his energy level was variable.  R. 322.  He was "thinking about the possibility of part time or volunteer work."  Id.  The only reported side effect from the Wellbutrin was mild dry mouth, and Dr. Gudis recommended that Torres continue with the medication.  R. 323.

On January 30, 2012, Dr. Gudis completed a Psychiatric/Psychological Impairment Questionnaire.  R. 312-19.  He diagnosed Torres with major depression on Axis I, loss of job and loss of apartment on Axis IV, and a current GAF score of 52.  R. 312. Torres's lowest GAF score in the previous year was 45.  Id.[5]  Dr. Gudis's clinical findings, indicated on a checklist, included: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interest, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and generalized persistent anxiety.  R. 313.  Torres's primary symptoms were

---

[5]  A GAF score of 45 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) (capitalization and emphasis omitted).

depressed mood, decreased energy, impaired sleep, and suicidal ideation.  R. 314.  As to Torres's

functional limitations, Dr. Gudis indicated that there was no evidence of limitation of the ability

to remember locations and work-like procedures, understand and remember one- or two-step

instructions, carry out simple one- or two-step instructions, sustain an ordinary routine without

supervision, make simple work-related decisions, interact appropriately with the general public,

ask simple questions or request assistance, maintain socially appropriate behavior and adhere to

basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate

precautions.  R. 315-17.  Torres was mildly limited (significantly affected in his ability to

perform the activity) in his ability to understand and remember detailed instructions, work in

coordination with or proximity to others without being distracted by them, travel to unfamiliar

places or use public transportation, and set realistic goals or make plans independently.  R. 314-

17.  He was moderately limited (significantly affected but not totally precluded from performing

the activity) in his ability to carry out detailed instructions, maintain attention and concentration

for extended periods, accept instructions and respond appropriately to criticism from supervisors,

get along with co-workers or peers without distracting them or exhibiting behavioral extremes,

and respond appropriately to changes in a work setting.  Id.  Torres was mildly to markedly

limited in his ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerance.  R. 315.  He was markedly limited (effectively precluded

from performing the activity in a meaningful manner) in his ability to complete a normal

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unacceptable number and length of rest periods.  R. 314, 316.  Dr.

Gudis indicated that Torres's symptoms and functional limitations were reasonably consistent

with the impairments described in the evaluation.  R. 314.  Dr. Gudis opined that Torres's

impairments were ongoing, creating an expectation that they would last at least 12 months.  R. 318.  He also noted that Torres was not a malingerer and that Torres's impairments were likely to produce "good days" and "bad days."  Id.  He could not estimate how often Torres would be likely to be absent from work as a result of his impairments.  R. 319.  Dr. Gudis opined that Torres could tolerate "low" work stress.  R. 318.  On April 10, 2012, Dr. Gudis wrote a narrative report containing this same information, which he stated was "consistent with" the January 30, 2012 Questionnaire.  R. 356-57.

In addition to his individual sessions with Mr. Heron and Dr. Gudis, Torres participated in group counseling at Riverdale Mental Health Center from July 2011 through November 2011.  R. 281-84, 287-95, 332-37, 340-44, 347-51.  He often participated verbally in the group's discussions, and he was consistently attentive even when he was not actively participating.  See id.

### 2.  Montefiore Marble Hill Family Practice

Torres received medical care at Montefiore Marble Hill Family Practice.  See R. 229-59, 361-91, 394-432.  During an appointment on June 30, 2011 with Dr. Angel Gonzalez, Torres stated that he walked two and a half miles every other day.  R. 231-32.  At a follow-up appointment on August 1, 2011, Torres reported a history of depression since losing his job, for which he was receiving treatment at Riverdale Mental Health Center.  R. 252.  Notes from this visit indicate that Torres did not have "severe depression" and that his condition had improved with psychotherapy.  Id.  They describe Torres as "alert and cooperative, [with] normal mood and affect, normal attention span and concentration."  R. 253.  Dr. Gonzalez assessed Torres as having "adjustment disorder with depressed mood" and recommended that he continue psychotherapy at Riverdale Mental Health Center.  Id.

9

3.      Visiting Nurse Services of New York

On May 7, 2012, Christine Gallagher, a licensed marriage and family therapist, wrote a narrative report, describing the services she provided to Torres.  R. 434.  Torres's father was a patient of the Visiting Nurse of N.Y./Bronx Hospice team, and after his death, Ms. Gallagher had counseling sessions with Torres on October 31, 2011, November 10, 2011, November 21, 2011, December 22, 2011, and January 26, 2012.  Id.  Those counseling sessions included "bereavement support" and offered "coping skills for ongoing development."  Id.

4.      Consultative Examination Report

Herb Meadow, M.D., conducted a psychiatric evaluation of Torres on July 1, 2011.  R. 201-04.  Torres traveled to the evaluation alone by public transit.  R. 201.  A report of the evaluation included a psychiatric history of hospitalizations for depression between 1983 and 2004.  Id.  Torres was in psychiatric treatment as a child for reasons he did not recall, and he had been "in and out" of treatment since then.  Id.  Torres was currently seeing Dr. Gudis at Riverdale Mental Health Center once per month and also attending therapy sessions there on a weekly basis.  Id.  The report noted that he was taking Zoloft at that time.  Id.

Torres reported that he had last worked in August 2010, when he was fired because he was "falsely accused of sexually molesting a 13-year-old girl."  Id.  Dr. Meadow's report stated that Torres has difficulty falling asleep, poor appetite, and a history of recurrent depression.  Id.  Torres described his current symptoms as including dysphoric moods, crying spells, loss of usual interest, irritability, low energy, diminished self-esteem, difficulty concentrating, diminished sense of pleasure, and being socially withdrawn.  Id.  Torres had suicidal thoughts in the past, but he denied any immediate plans to harm himself.  Id.  He had also experienced flashbacks and nightmares from being physically and sexually abused as a child.  R. 201-02.  Though Torres

10

had a history of panic attacks, he had not had one in the recent past.  R. 202.  He denied any

manic symptoms, thought disorder, and cognitive defects.  Id.  Torres had a history of

polysubstance abuse — including heroin, cocaine, PCP, LSD, and marijuana — but had been

substance-free since 1986.  Id.

　　　　Dr. Meadow's mental status examination showed that Torres's "demeanor was

cooperative" and his "manner of relating was adequate."  Id.  Torres's speech was "fluent and

clear," and his "[e]xpressive and receptive language was adequate."  Id.  His thought processes

were coherent and goal directed, and there was no evidence of hallucinations, delusions, or

paranoia.  Id.  Torres's affect was appropriate in speech and thought content, and his mood was

depressed.  Id.  His attention and concentration were intact for counting, calculations, and serial

3s from 20.  Id.  His recent and remote memory skills were intact — he could repeat three out of

three objects immediately and after five minutes, and he could repeat four numbers forward and

three backward.  R. 203.  His cognitive functioning was average, with his general fund of

information being somewhat limited, and his insight and judgment were both fair.  Id.

　　　　As to Torres's "mode of living," Dr. Meadow's report stated that Torres takes care of his

personal hygiene and does some household chores.  Id.  He socializes primarily with his

immediate family and spends time watching television and going for walks.  Id.  The report

further stated that Torres "would have some difficulty dealing with excessive stress and relating

adequate [sic] with others.  Otherwise, he will be able to handle all other tasks necessary for

vocational functioning."  Id.

　　　　Dr. Meadow diagnosed Torres with major depressive disorder, severe, without psychotic

features; and polysubstance abuse/dependence in remission.  Id.  He recommended that Torres

continue with psychiatric treatment and expressed a prognosis of "[f]air to guarded."  R. 204.

11

C.     Hearings Before the ALJ

A hearing before ALJ Mark Hecht was held on May 18, 2012.  R. 54-66.  Torres appeared in person, accompanied by his attorney.  R. 56.  Torres testified that he traveled to the hearing by train with a friend, because he is unable to travel alone.  R. 58.  He has difficulty traveling alone because he gets confused, loses his way, and his "brain doesn't process things right."  Id.

Torres has a high school diploma and attended one year of college.  Id.  He worked as a production manager in the communications field for 15 years.  R. 58-60  His duties were to "take down reservations, make sure the equipment was working properly," and report any malfunctioning equipment to his superiors.  R. 59.  This work required Torres to sit for about half the time and stand for about half the time, and he had no physical difficulty doing his job at the time he left.  R. 59, 61.  Torres left his job on August 17, 2010.  R. 60.  When questioned by the ALJ, Torres explained that he was discharged because he was "accused of touching a 14-year-old child."  Id.  Torres had never been accused of any misconduct previously.  R. 61.  Torres tried to find other work after he was discharged, applying for "a couple things," but he received no responses.  Id.  When the ALJ asked how Torres had supported himself since he stopped working, Torres replied that he had applied for welfare, was living with family, and was "living on $200 in food stamps, and that's all."  R. 62-63.  He tried to go to a job program through a public assistance agency, but he "just couldn't follow through."  R. 63.  When the ALJ asked if Torres had any "history of illicit drug use, or alcohol abuse," Torres replied, "No."  R. 64.

Torres testified that he had been treated for depression when he was younger, R. 63, but at the time he was discharged from his job, Torres was not under the care of a psychologist or

counselor, R. 61.  After he was discharged, Torres went to a psychiatrist, and he continued to be in treatment, attending various sessions three or four times per week.  R. 61-62.  Torres was on medication for depression, which he was taking and which helped him "[a] little bit."  R. 62. The medication caused side effects, including shaking, memory problems, and sleep disturbances.  Id.  He was not taking any medication to help him sleep.  R. 63.  Torres's depression had gotten worse since he lost his job in August 2010.  Id.

Torres denied that he had any limitations in sitting, standing, walking, lifting, or carrying, and confirmed that the basis of his alleged disability was, as the ALJ put it, his "reactive depression to what you were accused of."  R. 64.  The ALJ asked Torres whether, if offered a job in a related field or a different field, he would be able to perform it, and Torres responded "[r]ight now, no, sir."  Id.  Torres confirmed that he had difficulty concentrating, which would interfere with his ability to do what the ALJ described as "even a simple, light job."  Id.  Torres stated that "[t]hey've asked me to do volunteer work, and I can't even do that. . . .  [T]here's times I can't even get out of the house. . . .  It . . . takes everything just to . . . come here today, it . . . takes a lot out [of] me."  R. 65.  Torres testified that he stayed in his room most of the day, and that "I avoid seeing people and interacting with people.  I lost my father, too, this past year, and that's been very traumatic also."  Id.

The ALJ asked Torres if he had any other medical impairments or conditions that would interfere with his ability to work, and Torres responded that he did not believe so.  Id.

D.      The ALJ's Decision

On May 25, 2012, the ALJ issued a decision finding that Torres was not disabled.  R. 36-49.  The ALJ found that Torres had not engaged in substantial gainful activity since August 17, 2010, the alleged onset date of his disability.  R. 41.  The ALJ found that Torres had the "severe

impairment" of "major depression." Id.  The ALJ determined that this impairment did not

"meet[] or medically equal[] the severity of one of the listed impairments in 20 CFR Part 404,

Subpart P, Appendix 1." R. 42.  Specifically, the ALJ determined that Torres's mental

impairment did not satisfy listing 12.04 because the impairment does not cause at least two of

the following: "marked restriction" of the activities of daily living; "marked difficulties" in

social functioning; "marked difficulties" in concentration, persistence, or pace; or "repeated

episodes of decompensation," each of an extended duration.  Id.

   Next, the ALJ determined that Torres had the "residual functional capacity to perform a

full range of work at all exertional levels," with the nonexertional limitation that "he is limited to

unskilled work involving simple repetitive tasks and no supervisory responsibility." R. 43.  On

this point, the ALJ found that Torres had the "mental capacity to understand, remember, and

carry out simple instructions." Id.  He was also able to "use judgment to make work related

decisions commensurate with unskilled work;" to "interact appropriately with supervisors, co-

workers, and the general public;" and to "maintain attention and concentration for unskilled

tasks, and respond appropriately to changes in a routine work setting." Id.  In making this

finding, the ALJ stated that he "considered all symptoms and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence." Id.  With respect to Torres's symptoms, the ALJ followed a two-step process.

Id.  The first step was to determine "whether there is an underlying medically determinable

physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's

pain or other symptoms." Id.  Once such underlying impairment has been shown, the second

step was to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms

to determine the extent to which they limit the claimant's functioning." Id.  For purposes of this

second step, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." Id.

The ALJ summarized the record evidence he relied upon in making his determination. He noted that progress notes from the Riverdale Mental Health Center indicated that Torres began mental health treatment in January 2011, but that he declined to take medication until approximately March 2011. R. 43-44. In addition, Torres began treatment with Dr. Gudis in March 2011, "more than six months after the alleged onset date" of August 17, 2010. R. 44. The ALJ noted that Dr. Gudis's initial assessment of Torres included clinical findings of a depressed and anxious mood, depressive ideation, and suicidal ideation without active intent or plan, but that this assessment also indicated that Torres had normal speech, no abnormalities of thought process, no perceptual disorder, good judgment and insight, intact recent and remote memory, normal concentration, average intelligence, and intact impulse control. Id.

The ALJ stated that Dr. Gudis's findings were consistent with the findings of Dr. Meadow, who performed a consultative psychiatric evaluation for Torres's disability claim in July 2011. Id. The ALJ noted that Dr. Meadow's objective findings included adequate expressive and receptive language; coherent and goal-directed thought process; no evidence of hallucinations, delusions, or paranoia; appropriate affect; intact attention/concentration; intact recent and remote memory; average cognitive functioning; and fair insight and judgment. Id. He further noted that the only positive finding in Dr. Meadow's report was "a depressed mood." Id.

15

The ALJ summarized the clinical notes of Mr. Heron and Dr. Gudis, stating that "with the exception of episodic symptom exacerbations in reaction to significant personal stressors, the claimant's mood steadily improved with treatment, particularly after he was started on Wellbutrin in or about September 2011." Id.  The ALJ pointed to specific entries from the treatment notes, noting that "as early as April 2011 . . . Mr. Heron noted that [Torres] was in a more positive mood" and was helping a friend with a video project, in May 2011 "Mr. Heron described [Torres] as dispirited" after an unfavorable decision in his unemployment case, and in June 2011 "Mr. Heron noted that [Torres's] mood had substantially improved and he was feeling more energized; he was actively looking for work and planning a visit to his girlfriend in Texas." Id.  The ALJ also noted that Dr. Gudis indicated that Torres's "symptoms were not as intense as they had been several months earlier."  Id.  The ALJ stated that these notes "comport[] with Dr. Meadow's essentially normal findings in July 2011."  Id.

The ALJ stated that the "early improvement in [Torres's] mental health condition" was also documented in the records from Montefiore Marble Hill Family Practice, noting that Dr. Gonzalez's treatment note from June 2011 indicated that Torres "was exercising regularly, walking 2.4 miles every other day."  Id.  Further, the ALJ noted that Dr. Gonzalez's progress note from August 2011 reflected Torres's statement that "his symptoms had improved with psychotherapy and he was not severely depressed."  Id.  Dr. Gonzalez had also noted that Torres had a normal mood, affect, attention span, and concentration.  Id.

Returning to the treatment records from Riverdale Mental Health Clinic, the ALJ noted that Torres "reported feeling more depressed" between August 2011 to December 2011, "in the context of his father's illness and decision to discontinue dialysis, and his ultimate death."  Id.  However, Dr. Gudis noted in October 2011 — shortly after Torres's father's death — that

16

Torres's "depressive symptoms were less intense." Id.  Though Torres felt "sad and hopeless" in November 2011, the treatment notes indicated that "he was sleeping fairly well and felt better after a two-week visit with a friend." R. 45.  Torres "complained of frequent depressive symptoms and difficulty sleeping and concentrating" in December 2011, but "he responded almost immediately to an increase in medication dosage; less than one week later, Dr. Gudis noted that he appeared to be less depressed." Id.  Dr. Gudis also noted in January 2012 that Torres's "anxiety level had decreased and he was not experiencing severe depressive symptoms." Id.

Considering Torres's testimony, the ALJ determined that Torres's "medically determinable mental impairment could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id.  The ALJ reached this conclusion because the notes of Mr. Heron and Dr. Gudis showed that Torres "consistently had essentially normal mental status examinations." Id.  Acknowledging that Torres reported increased symptoms at times, the ALJ noted that these were "usually reactive to various psychological stressors," and he found "no clinical correlation of significant objective findings" or "evidence in the record of vegetative signs of depression, a thought disorder, or cognitive impairment." Id.  The ALJ noted that Torres's symptoms "waxed and waned in reaction to personal stressors," but concluded that Torres showed "substantial improvement" overall and was "stable with conservative treatment" such as medication but not hospitalization.  Id.  The ALJ found that Torres's assertion that he experienced significant side effects from medication was contradicted by Dr. Gudis's treatment notes, which indicated that

Torres's only side effects were "mild gastrointestinal symptoms and mild dry mouth, and the former resolved." Id.

Additionally, the ALJ stated that Torres's self-described activities were "at odds with the allegations of disabling functional limitations." Id. Specifically, Torres was "fully independent in his activities of daily living," traveled independently via public transportation (including traveling alone by subway to his consultative examination), exercised regularly, "maintained ongoing social contact with members of his family and a girlfriend," visited friends, gathered letters of reference and looked for work, participated in unemployment insurance and housing claims, and did unpaid video work for a friend. Id. The ALJ found that "[t]his range of activity is inconsistent with the allegations of disabling symptoms and limitations that preclude the performance of work." Id. For these reasons, the ALJ found that Torres's allegations were "not credible" to establish his disability. R. 46.

The ALJ found that Torres had "some nonexertional mental limitations associated with episodic depressive symptoms," but those symptoms "remitted and improved with treatment." Id. The ALJ determined that Torres "has the ability to meet the physical and mental demands of competitive remunerative work." Id. However, to account for Torres's "episodic depressive symptoms and proven limitations," the ALJ found he was limited to "unskilled work consisting of simple repetitive tasks and not involving supervisory duties." Id.

The ALJ acknowledged the "treating physician rule," which advises deference to a claimant's primary-care physician where the record contains no substantial inconsistent evidence. Id. However, the ALJ found that Torres's treatment records indicated "mostly normal objective findings" and did not support "the degree of symptoms and functional limitations described in Dr. Gudis's April 2012 narrative report." Id. Specifically, Dr. Gudis's own

18

treatment notes stated that Torres's symptoms varied in intensity, which contradicted the

narrative report's statement that Torres consistently exhibited symptoms of appetite disturbance

with weight change, sleep disturbance, mood disturbance, emotional lability, anhedonia or

pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating,

suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and generalized

persistent anxiety.  Id.  The ALJ further noted that the degree of functional limitation found by

Dr. Gudis in April 2012 did not accord with Dr. Meadow's report, or Torres's own statements

about his activities.  Id.  Thus, the ALJ accorded more weight to Dr. Gudis's contemporaneous

treatment notes, to the extent that his April 2012 report was inconsistent with them.  Id.  Based

on this, the ALJ rejected Dr. Gudis's assessment that Torres has "a marked chronic inability to

perform within a schedule, maintain regular attendance, or complete a normal workweek without

interruption from psychologically-based symptoms or perform at a consistent pace without an

unreasonable number and length of rest periods."  Id.  Rather, he gave "significant weight" to Dr.

Meadow's opinion that Torres is "capable of performing all vocational tasks," noting that Dr.

Meadow's findings "comport with Dr. Gudis's earlier findings in March 2011."  R. 47.

However, he found that Torres's "personal stressors and episodic reactive symptoms" were

sufficiently documented and sufficiently severe "to support a limitation to unskilled work."  Id.

　　　　Based on these findings, the ALJ determined that Torres was "unable to perform his past

relevant work," which was "at least semi-skilled in nature and involved supervision of others."

Id.  However, considering Torres's age, education, work experience, and residual functional

capacity, the ALJ determined that "there are jobs that exist in significant numbers in the national

economy that [Torres] can perform."  Id.  Because Torres's limitations did not significantly

diminish his ability to perform unskilled work at all exertional levels, the ALJ found it

appropriate to rely on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,

Appendix 2, without eliciting testimony from a vocational expert.  R. 48.  The ALJ concluded

that Torres was "not disabled."  Id.

      E.      Medical Evidence Submitted to the Appeals Council

Torres submitted additional medical evidence to the Appeals Council in his request for

review of the ALJ's decision.  See R. 9, 23, 199-200, 483.  This evidence included a "medical

assessment" from Alexandra Whoriskey, M.D., dated May 4, 2012; treatment notes from Dr.

Whoriskey dated May 23, 2012; a narrative report from Azariah Eshkenazi, M.D., dated July 17,

2012, and an assessment from Dr. Eshkenazi.  R. 9, 483.  We summarize that evidence below.

      1.      Dr. Whoriskey

On May 4, 2012, Dr. Whoriskey conducted a psychiatric evaluation of Torres for the

PROS program at Riverdale Mental Health Center.  See R. 438-40.  A report of that evaluation

stated that Torres was initially scheduled to meet with Dr. Whoriskey on an earlier date, but he

missed the appointment because "he was working with a friend trying to make a little money."

R. 438.

Dr. Whoriskey's report included a past psychiatric history, noting that Torres had seen a

psychiatrist as a child, had attempted suicide in his early 20's after a breakup with his girlfriend,

and had received outpatient psychiatric treatment intermittently since 1980.  R. 438-39.  Torres

had also been hospitalized four times, first at age 28.  R. 439.  Additionally, Torres had

undergone treatment for substance abuse.  See id.  Torres reported having a brother with

schizophrenia and that his "[m]ain supports" were his aunt, brother, and a few longtime friends.

Id.

The report stated that Torres's current episode of depression began after he lost his job in August 2010 and worsened after his father's death.  R. 438.  He began treatment with the RESOLVE program at Riverdale Mental Health in November or December 2010, after attempting suicide by overdosing on a days-long binge of cocaine.  Id.  Since that time, he had been sober.  Id.

Torres reported that he was feeling "very depressed and angry at his situation" and that he had "frequent suicidal thoughts and wishes he were dead" and "violent thoughts about harming the people that ruined his life by letting him go from his job," though he had "no intention of acting on these thoughts."  Id.  Torres stated that he was "easily irritated by people," but he "tries to isolate so as to not lash out" and "distract[s] [him]self with TV or music."  Id.  His other symptoms included disturbed sleep, racing thoughts, feeling like he was jumping out of his skin, crying spells, panic attacks, poor appetite, low energy, low enjoyment, and an inability to focus.  Id.  He occasionally had thought he heard things and talked to himself, and he had some paranoia but was able to "reality test with himself."  Id.

As of the May 4, 2012 appointment, Torres had run out of his medication and had not taken it for two weeks.  Id.  However, he stated that "on the [W]ellbutrin he focuses better, feels less down, is able to think better, and is able to shut off any suicidal or violent thoughts easily." Id.  At the appointment, Torres made good eye contact, was cooperative (but said "I don't remember" in response to a number of Dr. Whoriskey's questions), had normal speech, and had a constricted affect and congruent mood that was labile only when he talked about his father.  R. 439.  His judgment was "fair to good," concentration and abstraction "fair," and calculations "good."  R. 439-40.   Torres's long-term memory was "fair," and in a test of short-term memory

he recalled 3/3 words immediately, 2/3 at one minute, 2/3 at five minutes, and 3/3 with prompts.

Id.

Dr. Whoriskey diagnosed Torres with major depressive disorder, polysubstance abuse in remission, and rule-out bipolar II disorder on Axis I.  R. 440; see Pl. Mem. at 5.  On Axis IV, she diagnosed "severe — employment, death of parent, financial," and recorded Torres's GAF score as 35.  R. 440.[6]  She recommended that he continue in the PROS program, restart Wellbutrin, and obtain clinical treatment.  Id.

Torres had another appointment with Dr. Whoriskey on May 23, 2012.  R. 441.  Dr. Whoriskey's notes indicate that Torres was "apologetic and embarassed" that he missed his appointment the week before, but he was in court for his disability hearing.  Id.  Dr. Whoriskey stated that Torres was "focussed [sic] on [the] employment hearing and getting his reputation back."  Id.  He was "very angry" about his employment situation, but he denied any thoughts of violence to the individuals that fired him.  Id.  Torres had been taking Wellbutrin for the past two weeks and reported that it was helping him, but "not yet as much as [it] had in [the] past."  Id.  He was still experiencing some of his previous symptoms, but he found that he could "distract himself and stop suicidal thoughts now whereas before he was unable to do so."  Id.

On July 5, 2012, Dr. Whoriskey completed a Psychiatric/Psychological Impairment Questionnaire.  R. 443-50.  In it, Dr. Whoriskey diagnosed Torres with major depression and recurrent polysubstance abuse in remission.  R. 443.  Torres's current GAF score was 45, and his

---

[6]  A GAF score of 35 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . )."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) (capitalization and emphasis omitted).

lowest GAF score in the past year was 30.  Id.[7]  The prognosis was "guarded."  Id.  Using a checklist, Dr. Whoriskey recorded clinical findings of appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and hostility and irritability.  R. 444.  Torres's primary symptoms were "depressed mood, suicidal thoughts with no current intent to harm self, poor sleep, low energy, social withdrawal, low motivation, [and] irritability."  R. 445.  These symptoms and his functional limitations were "reasonably consistent" with the impairments described in the evaluation.  Id.

Using another checklist, Dr. Whoriskey opined that Torres was markedly limited in his ability to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; to sustain an ordinary routine without supervision; to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; and to accept instructions and respond appropriately to criticism from supervisors.  R. 446-48.  Torres was moderately limited in his ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being

---

[7]  A GAF score of 30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations," or that there is a "serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation)," or that there is an "inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000) (emphasis omitted).

distracted by them; to interact appropriately with the general public; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently.  Id.  He was mildly limited in his ability to make simple work-related decisions; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions.  Id.  Dr. Whoriskey found no evidence that Torres was limited in his ability to remember locations and work-like procedures, to understand and remember one- or two-step instructions, to carry out simple one- or two-step instructions, or to travel to unfamiliar places or use public transportation.  R. 446-48.  Dr. Whoriskey indicated that Torres's impairments were ongoing and that she expected them to last at least 12 months.  R. 449.  According to Dr. Whoriskey, Torres's symptoms "have periods of improvement and significant worsening" — put another way, his impairments were "likely to produce 'good days' and 'bad days.'"  Id.  Dr. Whoriskey stated that when Torres is "doing better" he is able to manage low-stress environments, but "when he is worse" he is unable to manage even low-stress environments.  Id.  She estimated that Torres would likely be absent from work more than three times per month as a result of his impairments.  R. 450.

Dr. Whoriskey indicated that Torres is not a malingerer.  R. 449.  She did not answer a prompt asking "what is the earliest date that the description of symptoms and limitations in this questionnaire applies?"  R. 450.

      2.     Dr. Azariah Eshkenazi

Dr. Eshkenazi evaluated Torres on July 17, 2012.  See Ex. A to Pl. Mem. at 1.[8]  In a

Psychiatric/Psychological Impairment Questionnaire completed that same date, Dr. Eshkenazi

diagnosed Torres with "major depression" and recorded his current GAF and lowest GAF in the

past year as 50-55.  Id. at 1, 8.  Dr. Eshkenazi's prognosis for Torres was "guarded."  Id. at 1.

Dr. Eshkenazi's clinical findings, recorded on a checklist, included appetite disturbance with

weight change, sleep disturbance, mood disturbance, anhedonia or pervasive loss of interests,

feelings of guilt/worthlessness, difficulty concentrating, social withdrawal or isolation, decreased

energy, and generalized persistent anxiety.  Id. at 2.  Using another checklist, Dr. Eshkenazi

indicated that Torres was markedly limited in his ability to understand and remember detailed

instructions; to carry out detailed instructions; to maintain attention and concentration for

extended periods; to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerance; to work in coordination with or proximity to others without

being distracted by them; and to complete a normal workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods.  Id. at 4-6.  Torres was moderately limited in his ability to

remember locations and work-like procedures, to sustain an ordinary routine without

supervision, to interact appropriately with the general public, to get along with co-workers or

peers without distracting them or exhibiting behavior extremes, to respond appropriately to

changes in the work setting, and to set realistic goals or make plans independently.  Id.  He was

mildly limited in his ability to understand and remember one- or two-step instructions, to carry

---

[8]  This Questionnaire was apparently submitted to the Appeals Council with Dr.
Eshkenazi's narrative report, see Pl. Mem. at 8 n.17, but the Questionnaire was not included in
the record filed with the Court.

out simple one- or two-step instructions, to make simple work-related decisions, to ask simple questions or request assistance, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Id.  Dr. Eshkenazi found no evidence that Torres was limited in his ability to be aware of normal hazards and take appropriate precautions, or to travel to unfamiliar places or use public transportation.  Id.  The doctor noted that Torres does not "experience episodes of deterioration or decompensation in work or work like settings" which would cause him to withdraw or his symptoms to become worse.  Id. at 6.

Dr. Eshkenazi opined that Torres's impairments were ongoing and that he expected them to last at least 12 months.  Id. at 7.  He further noted that Torres was not a malingerer.  Id.  The doctor determined that Torres was capable of "low stress" and that Torres was likely to have "good days" and "bad days" as a result of his impairments.  Id.  Dr. Eshkenazi considered that Torres was likely to be absent from work, on average, more than three times per month as a result of his impairments.  Id. at 8.  Dr. Eshkenazi did not indicate the earliest date that the description of symptoms and limitations described in the Questionnaire applied to.  Id.

Dr. Eshkenazi recorded these findings in a narrative report, dated July 19, 2012.  R. 484-86.  That narrative report was based on the July 17, 2012 evaluation and upon Dr. Eshkenazi's review of "a large amount of medical records . . . documenting Mr. Torres' psychiatric history of Severe Depression."  R. 484.  The report noted that Torres "stated that he is unable to work and feels severely depressed" and that Torres denied any history of drug or alcohol abuse.  R. 485.  When Dr. Eshkenazi asked Torres how he spends his days, Torres "stated that he stays at home and usually sleeps.  He avoids people and has absolutely no social life nor does he have any desire for a social relationship."  Id.  Dr. Eshkenazi noted that Torres cried and "had difficulty controlling his emotions" when speaking on the topic of work.  Id.

26

The report stated that Torres's speech was coherent, his thought processes responsive, his recent and remote memory good, his affect constricted, and his judgment and insight good. R. 486. Torres denied any active suicidal ideation in his conversation with Dr. Eshkenazi. Id. Dr. Eshkenazi concluded "with a reasonable degree of medical certainty" that, at the time of the report, Torres was "not able to be gainfully employed," which occurred "as a result of his psychiatric condition." Id.

II.     APPLICABLE LAW

    A.     Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) (2012) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . "). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted); see McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the

Commissioner's conclusion must be upheld.") (citation omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

      B.      Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1, 404.1520(a)(4) (2014); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other

work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be

deemed disabled.  Id.  The claimant bears the burden of proof on all of these steps except the

final one — that is, proving that there is other work the claimant can perform.  See Poupore v.

Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.    DISCUSSION

Torres seeks reversal of the ALJ's decision on the grounds that the ALJ failed to follow

the treating physician rule, failed to properly evaluate Torres's credibility, and "erred in relying

on the medical-vocational guidelines."  Pl. Mem. at 10-20, 22-24.  He also asserts that the case

must be remanded "[b]ased on [n]ew [e]vidence [b]efore the Appeals Council."  Id. at 20-22.

We address each of these claims in turn.

A.    The Treating Physician Rule

Torres argues that remand is required because the ALJ failed to follow the treating

physician rule.  See Pl. Mem. at 10-15.  Specifically, Torres claims that the ALJ "erred by

rejecting the opinions from treating physician Dr. Gudis for the findings from examining and

non-examining medical consultants," id. at 11, because Dr. Gudis's opinions were "supported by

appropriate psychiatric findings borne out by the longitudinal treatment record," id. at 12.

In determining whether a claimant is disabled, a treating physician's opinion is entitled to

controlling weight if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2).  Under this rule, the Commissioner is not required to give

deference to the treating physician's opinion where the treating physician "issued opinions that

are not consistent with other substantial evidence in the record, such as the opinions of other

medical experts."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (citation

omitted).  Moreover, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

Where an ALJ does not give controlling weight to the opinion of a treating physician, he must consider other factors in determining what weight to give the available opinions.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); accord Halloran, 362 F.3d at 32.  These factors include: (1) the "[l]ength of the treatment relationship and the frequency of examination," (2) the "[n]ature and extent of the treatment relationship," (3) the evidence and explanations supporting an opinion, (4) the consistency of the opinion with the record as a whole, and (5) whether the person offering the opinion is a specialist in the area at issue.  20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5).  Additionally, the ALJ must provide "good reasons" for not affording the treating physician's opinion controlling weight.  E.g., Halloran, 362 F.3d at 32; accord 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ did not entirely accept the assessment in Dr. Gudis's April 2012 narrative report and medical source statement.  R. 46.  The ALJ found that the opinions therein — that Torres consistently exhibited clinical findings such as appetite disturbance with weight change, sleep disturbance, mood disturbance, and suicidal ideation or attempts; and that Torres had certain marked or significant functional limitations — were not consistent with Dr. Gudis's own treatment notes.  Id.  According to the ALJ, those treatment notes "indicate that [Torres's] symptoms varied in intensity, at times remitted, and moreover, his severe depressive symptoms improved with treatment and resolved in January 2012."  Id.  The ALJ acknowledged that Dr. Gudis specialized in psychiatry, and that he had been treating Torres since March 2011.  R. 44.

31

But he chose to accept Dr. Gudis's assessment in his treatment notes over his April 2012 report, noting that the treatment notes were consistent with the findings of Dr. Meadow and with Torres's own descriptions of his activities and were supported by evidence not only in Dr. Gudis's own notes, but in those of Mr. Heron as well.  R. 44-46.

We cannot find that the ALJ violated the treating physician rule in making this determination.  Though he did not give controlling weight to Dr. Gudis's April 2012 report, he adequately considered the factors to determine what weight his opinion should receive.  As the ALJ noted, there is evidence in the record that Torres improved with treatment, particularly after he began taking Wellbutrin.  For example, after taking an increased dose of the medication for approximately one week, Torres reported to Dr. Gudis that it had helped him "to fend off depressive thoughts and to be somewhat more energetic," R. 324, and later reported that his anxiety had decreased, he had not been experiencing severe depressive symptoms, his energy level was variable, and that he was thinking about undertaking part-time or volunteer work.  R. 322.  Indeed, Torres told Dr. Whoriskey that he "focuses better, feels less down, is able to think better, and is able to shut off any suicidal or violent thoughts easily" when he takes Wellbutrin.  R. 438.

Additionally, the ALJ's rejection of Dr. Gudis's contention that Torres "consistently exhibited" clinical findings such as sleep and mood disturbance, anhedonia or pervasive loss of interests, social withdrawal or isolation, and decreased energy, R. 46, 356, finds support in the record.  As the ALJ noted, Torres's mood and symptoms varied over time, often in response to "various psychosocial stressors," such as his father's illness and death.  R. 45; see also, e.g., R. 277 (treatment notes from Mr. Heron on August 25, 2011 indicating that Torres was very depressed, reporting that his father's health had deteriorated); R. 345, 352 (treatment notes from

Dr. Gudis on October 13, 2011 indicating that Torres was feeling "sad about the loss" when his father died.  However, the ALJ also noted that the record indicated that Torres's mood and symptoms often seemed to improve.  R. 44; see also, e.g., R. 300 (treatment notes from Mr. Heron indicating that on April 25, 2011, Torres was "in [a] more positive mood" and had helped a friend in a video lab, creating a "sense of accomplishment"); R. 297 (treatment notes from Dr. Gudis on June 7, 2011 indicating that Torres was exercising regularly and was engaged in his unemployment case); R. 286 (treatment notes from Mr. Heron indicating that Torres was "in somewhat positive spirits" after spending a weekend with friends); R. 231-32, 252-53 (notes from Torres's primary care physician in June 2011 and August 2011, describing Torres as "alert and cooperative, normal mood and affect, normal attention span and concentration" and noting that he reported walking two-and-a-half miles every other day and that his depression had improved with psychotherapy).

The ALJ thus adequately considered the factors to determine how heavily to weigh the opinion evidence of Dr. Gudis.  Given the inconsistencies between Dr. Gudis's evaluation and his notes as to Torres's condition, and given the findings of Dr. Meadow, the ALJ could properly discount Dr. Gudis's April 2012 report of Torres's limitations.

B.     The ALJ's Evaluation of Torres's Credibility

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (construing and citing

with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985).  Nonetheless,

where credibility regarding the claimant's residual functional capacity, regulations impose some

burden on the ALJ to explain his or her decision.  As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required
> to take the claimant's reports of . . . limitations into account, 20 C.F.R. § 416.929;
> see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d
> Cir. 1980), but is not required to accept the claimant's subjective complaints
> without question; he may exercise discretion in weighing the credibility of the
> claimant's testimony in light of the other evidence in the record.  Marcus v.
> Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49.  To evaluate a claimant's assertion of a limitation, the ALJ must engage

in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged.  20 C.F.R. § 404.1529(b). . . .  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence" of record.  Id. The ALJ must consider
> "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions,
> [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s]
> to medical sources during the course of examination or treatment, or to [the agency]
> during interviews, on applications, in letters, and in testimony in [its] administrative
> proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R.
> 96–7p.

Id. (alterations in original).

At the first step, the ALJ determined that Torres suffers from a medically determinable

impairment that could reasonably be expected to produce his alleged symptoms.  R. 45.

However, at the second step, the ALJ found that Torres's "statements concerning the intensity,

persistence and limiting effect of these symptoms" were not credible to the extent that they were

inconsistent with other evidence considered in the ALJ's functional capacity assessment.  Id.

The ALJ specifically identified record evidence that was inconsistent with Torres's claims

34

regarding his symptoms.  R. 44-45.  First, he noted that Torres "initiated mental health treatment in January 2011 but declined to take any medication until in or about March 201[1]," which "suggests that his symptoms were not, at least initially, as severe as alleged."  R. 44.  Second, the ALJ stated that the "clinical notes of the treating therapist and psychiatrist" indicated that, "with the exception of episodic symptom exacerbations in reaction to significant personal stressors," Torres's mood "steadily improved with treatment, particularly after he was started on Wellbutrin in or about September 2011" and that these notes were consistent with Dr. Meadow's "essentially normal findings in July 2011" and Dr. Gonzalez's treatment notes of June 2011 and August 2011.  Id.  This evidence, too, was inconsistent with Torres's allegations about the severity of his symptoms.  See R. 45.  Third, the ALJ did not credit Torres's representation that he experienced significant side effects from his medication because Dr. Gudis's treatment notes indicated that Torres's "only side effects were mild gastrointestinal symptoms and mild dry mouth," the former of which "resolved."  Id.  Fourth, the ALJ noted that although Torres claimed his sleep was disturbed, he testified at the hearing that he did not take any medication to address this problem.  Id.  Fifth, the ALJ found that Torres's own descriptions of his activities were inconsistent with his allegations about the severity of his symptoms and his inability to work.  Id.  Though Torres claimed at the hearing that he could not travel alone, R. 58, the ALJ noted that he traveled by public transportation alone to the consultative evaluation with Dr. Meadow, R. 45; see R. 201.  And although Torres "allege[d] self-isolative behavior," he attended and participated in group therapy sessions; exercised regularly; maintained social contact with family, friends, and a girlfriend; pursued unemployment and housing claims; looked for work; and did unpaid video work for a friend during the relevant period.  R. 45.

35

Torres states that "there is no dispute that [he] has good days and bad days" but argues that the fact that he "had periods of improvement does not mean that he can hold a regular job 8 hours a day, 40 hours a week." Pl. Mem. at 17. Though Torres correctly notes that an ALJ may not "simply pick and choose from the transcript only such evidence that supports his determination," id. (quoting Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004)), that is not the case here. The ALJ explicitly addressed Torres's claims that his symptoms rendered him unable to work, that he experienced side effects from his medication, that he isolates himself from others, and that he cannot travel alone. See R. 44-45. The ALJ considered that other evidence contradicted these claims and statements by Torres. See id. Given the evidentiary conflict, the ALJ determined not to credit Torres's claims about the severity of his symptoms and their impact on his ability to work. See R. 46. This is the sort of determination that is left to the ALJ rather than the reviewing court. See, e.g., Carroll, 705 F.2d at 642; Sutherland, 322 F. Supp. 2d at 289 ("It is not the place of the district court to weigh the credibility of complex, contradictory evidence, or reconsider anew whether the claimant is disabled.").

We find that the ALJ adequately considered the extent to which Torres's statements about his symptoms were consistent with other record evidence, including treatment notes from his therapist and doctors and his own statements about his sleep, medication side effects, and activities. Moreover, the ALJ adequately explained his decision to not to credit Torres's statements to the extent of establishing a disability.

C.      The ALJ's Reliance on the Medical-Vocational Guidelines

At step five in the disability evaluation process, "the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform," and an

"ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." McIntyre, 758 F.3d at 151; see Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids).") (citations and internal quotation marks omitted).  As the Second Circuit has noted, "exclusive reliance on the grids is inappropriate where [they] fail to describe the full extent of a claimant's physical limitations," particularly where any exertional limitations are "compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform." Rosa, 168 F.3d at 78 (quoting Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)) (quotation marks omitted).  But the Second Circuit has also noted that "the mere existence of a nonexertional impairment does not automatically preclude reliance on the guidelines." Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010) (citation, quotation marks, and ellipsis omitted). Rather, the question is whether a claimant's nonexertional impairment significantly limits his or her range of work.  See Bapp, 802 F.2d at 605-06.  A nonexertional limitation "'significantly limits' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Zabala, 595 F.3d at 411 (quoting Bapp, 802 F.2d at 605-06) (alteration omitted).

Here, after noting that Torres did not allege any exertional limitations, the ALJ found that Torres could not perform his past relevant work.  R. 47.  Proceeding to the fifth step of the evaluation process, the ALJ turned to the grids to determine whether Torres could perform other work.  See R. 47-48.  Based on the grids and Torres's residual functional capacity, age, education, and work experience, the ALJ found that "there are jobs that exist in significant

numbers in the national economy" that Torres could perform, and that he therefore was not disabled.  Id.

Torres claims that the ALJ erred in relying on the grids to make his determination.  Pl. Mem. at 22-24.  He argues that he has "significant non-exertional limitations," precluding reliance on the grids.  Id. at 22 (citing Rosa, 168 F.3d at 78 and 20 C.F.R. Part 404, Subpart P, Appendix II, Rule 200.00(e)(1))

The ALJ found that Torres had the "residual functional capacity to perform a full range of work at all exertional levels," with the nonexertional limitation that "he is limited to unskilled work involving simple repetitive tasks and no supervisory responsibility."  R. 43.  The ALJ limited Torres to unskilled work "to accommodate his episodic depressive symptoms and proven limitations."  R. 46.  With respect to this nonexertional limitation, the ALJ found that Torres "has the mental capacity to understand, remember, and carry out simple instructions; use judgment to make work related decisions commensurate with unskilled work; interact appropriately with supervisors, co-workers, and the general public; maintain attention and concentration for unskilled tasks[;] and respond appropriately to changes in a routine work setting."  R. 43.  These statements do not indicate that the limitation is significant, and Torres himself acknowledges that the ALJ found only "moderate" nonexertional limitations.  Pl. Mem. at 23.

Nonetheless, Torres argues that the "finding of up to moderate limitations in social functioning and in concentration, persistence, or pace alone precluded reliance on the grids."  Id. (citing Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 439 (S.D.N.Y. 2010); Baldwin v. Astrue, 2009 WL 4931363, at *27-28 (S.D.N.Y. Dec. 21, 2009); Zwick v. Apfel, 1998 WL 426800, at *8 (S.D.N.Y. July 27, 1998)).  As the cases cited by Torres demonstrate, the inquiry

into whether a nonexertional limitation is so significant that the grids cannot be used is highly fact-specific. See Correale-Englehart, 687 F. Supp. 2d at 439 (ALJ's "cherry-pick[ing]" certain findings on claimant's psychological limitations and ignoring others, coupled with the determination that the claimant suffered from an adjustment disorder and moderate, episodic depression precluded reliance on grids); Baldwin, 2009 WL 4931363, at *28 (a consulting physician's finding that the claimant suffered moderate limitations in numerous areas bearing on activities of daily life and social functioning, supported by substantial evidence in the record, precluded reliance on grids); Zwick, 1998 WL 426800, at *8-9 (ALJ did not adequately consider psychological problems which consulting physician said resulted in moderate limitations of activities of daily life and in maintaining social functioning, precluding reliance on the grids).

Here, the ALJ found that Torres could perform unskilled work and was not limited in his ability to understand, remember, and carry out simple instructions; to use judgment to make work-related decisions commensurate with unskilled work; to interact appropriately with supervisors, co-workers, and the general public; to maintain attention and concentration for unskilled tasks; and to respond appropriately to changes in a routine work setting. R. 43. This is similar to the situation in Zabala v. Astrue, 595 F.3d 402 (2d Cir. 2010), which upheld reliance on the grids where the ALJ found that the claimant was not limited in her ability "to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision." Id. at 411. The ALJ's consideration of Torres's abilities was supported by Dr. Meadow's assessment, which stated that Torres's "demeanor was cooperative," his "manner of relating . . . adequate," his speech "fluent and clear," his "expressive and receptive language . . . adequate," his thought processes coherent and goal directed, his affect appropriate in speech and thought content, his attention and concentration intact, his recent and

remote memory skills intact, his cognitive functioning average, and his insight and judgment fair.  R. 202-03.  It was also consistent with some of the opinions expressed by Dr. Gudis in his January 2012 assessment and April 2012 report, including that there was no evidence of limitation of Torres's ability to remember locations and work-like procedures, understand and remember one- or two-step instructions, carry out simple one- or two-step instructions, sustain an ordinary routine without supervision, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions.  R. 315-17.

Unlike the cases cited by Torres, the ALJ here did not "cherry-pick[]" evidence from the record or fail to consider important pieces of evidence in determining that Torres's nonexertional impairment did not constitute a limitation so significant that reliance on the grids was precluded.  Rather, after assessing the medical evidence, the ALJ ultimately found that Torres was capable of performing any unskilled work involving simple, repetitive tasks, without supervisory responsibility.  We cannot say that this constitutes a restriction that so narrows the range of work available "as to deprive [Torres] of a meaningful employment opportunity."  Zabala, 595 F.3d at 411.  Thus, the ALJ's reliance on the grids was permissible, and remand for testimony from a vocational expert is not required.

D.   New Evidence Before the Appeals Council

The Second Circuit has held that a claimant is authorized to submit additional evidence to the Appeals Council when requesting review of an ALJ's decision.  Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)).  When the Appeals Council denies review of the ALJ's decision, such evidence "becomes part of the administrative record

for judicial review," so long as it is new, material, and relates to the period on or before the ALJ's decision.  Id. at 45 (recognizing disagreement among the circuits).  The district court must examine the entire record, including record evidence that was first presented to the Appeals Council, to determine whether there is substantial evidence to support the Commissioner's decision.  Id. at 46; accord, e.g., Urena v. Colvin, 2015 WL 585583, at *9 (S.D.N.Y. Feb. 11, 2015).

        Here, Torres submitted additional evidence, in the form of reports, evaluative questionnaires, and notes from Dr. Whoriskey and Dr. Eshkenazi.[9]  See R. 8-9.  The Appeals Council stated that it considered this additional evidence, but it found no reason to reverse the ALJ's decision.  R. 5.  Torres claims that this evidence is new, material, and relevant to the period at issue.  See Pl. Mem. at 21.  He further claims that the opinions of Dr. Whoriskey and Dr. Eshkenazi support Dr. Gudis's findings, such that the three doctors found "nearly identical abnormalities on mental status examination."  Id.  This, according to Torres, is reason to require that the case be remanded for reconsideration.  See id. at 22.  In opposition, the Commissioner seems to make two arguments: first, that the evidence from Dr. Whoriskey and Dr. Eshkenazi should not become part of the record because they are not relevant to the period on or before the ALJ's decision, and second, that even if the evidence is considered as part of the record, it does not contradict the findings of the ALJ.  See Comm'r Mem. at 29-30.

        With respect to Dr. Eshkenazi, we agree that the evidence is not relevant to the period at issue here.  The ALJ rendered his decision on May 25, 2012.  R. 36.  Dr. Eshkenazi did not meet

---

[9]  Torres also submitted other additional evidence to the Appeals Council.  See R. 8 (list of exhibits submitted by Torres, appended to the Appeals Council's decision).  However, Torres's argument here only mentions the evidence from Dr. Whoriskey and Dr. Eshkenazi, see Pl. Mem. at 20-22, so we consider only this evidence.

with Torres until July 17, 2012.  R. 484.  Dr. Eshkenazi stated that he had reviewed "a large amount of medical records" detailing Torres's history of depression, but he did not specify the dates of those records.  Id.  Nor did he opine on Torres's mental health or ability to work in the months prior to his evaluation.  See R. 486 ("[A]t this time, as a result of his psychiatric condition, Mr. Guillermo Torres is not able to be gainfully employed.") (emphasis added); Ex. A to Pl. Mem. at 8 (question regarding the earliest date that the Questionnaire's description of symptoms and limitations applies to was left unanswered).  Thus, we do not consider Dr. Eshkenazi's evaluation questionnaire or narrative report to be part of the record.

Dr. Whoriskey first saw Torres on May 4, 2012, just three weeks before the ALJ issued his decision.  See R. 36, 438.  While the Commissioner implies that this timing suggests that Dr. Whoriskey's evidence is not relevant to the period at issue, see Comm'r Mem. at 29, we find it unnecessary to address this argument.  Even accepting that the evidence from Dr. Whoriskey related to the relevant period and therefore forms part of the record for review, we do not consider that it suggests there is not substantial evidence to support the ALJ's decision.  Much of Dr. Whoriskey's evidence is consistent with the ALJ's decision: the ALJ noted that Torres's condition seemed to improve with medication and treatment, see R. 45, and Dr. Whoriskey's treatment notes indicate that, when she first saw Torres, he had been off Wellbutrin for two weeks, but that he "focuses better, feels less down, is able to think better, and is able to shut off any suicidal or violent thoughts easily" when he takes the medication, R. 438.  When Dr. Whoriskey saw Torres again less than three weeks later, Torres reported that he was taking Wellbutrin again and that it was "helping him."  R. 441.  Additionally, Dr. Whoriskey's treatment notes indicate that Torres postponed his first appointment with her because he was "working with a friend trying to make a little money," R. 438, indicating that his condition did

not preclude employment.  Though Dr. Whoriskey eventually opined that Torres would at times

be incapable of handling stress and would likely be absent from work three or more times per

month due to his impairment, R. 449-50, we cannot find that this evidence suggests that there

was not also substantial evidence to support the ALJ's factual findings and ultimate decision that

Torres is not disabled.  See, e.g., Genier, 606 F.3d at 49 ("Even where the administrative record

may also adequately support contrary findings on particular issues, the ALJ's factual findings

must be given conclusive effect so long as they are supported by substantial evidence.") (citation

and internal quotation marks omitted).

For these reasons, remand is not required based on the additional evidence submitted to

the Appeals Council.

IV.    CONCLUSION

For the reasons stated above, Torres's motion for judgment on the pleadings (Docket

# 11) is denied, and the Commissioner's motion for judgment on the pleadings (Docket # 18) is

granted.

Dated: March 17, 2015
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

43